H. James GEDIMAN, as Executor of the Last Will and Testament of James E. Barsi, deceased, and George A. Barsi, as Administrator with the Will annexed of the Estate of James E. Barsi, deceased, Plaintiffs,

v.

ANHEUSER–BUSCH, INC., Defendant.

Civ. A. No. 19124.

United States District Court
E. D. New York.

March 28, 1961.

On Motion to Amend Finding.

May 8, 1961.

Meyer H. Slack, New York City, by Allen Moss and Herbert B. Rose, New York City, of counsel, for plaintiffs.

White & Case, New York City, by Thomas Kiernan and Thomas B. Leary, New York City, of counsel, for defendant.

BYERS, District Judge.

Decision is here required as to the amount payable to the executor of the Estate of James E. Barsi, deceased, under the "Salaried Employees' Pension Plan" adopted by defendant Anheuser-Busch, Inc. ("Anheuser") which bears date of December 29, 1952. For some undisclosed reason, participation in that Plan dates from November 1, 1952 according to the provisions of a "Certificate of Participation" issued to Barsi bearing that date.

There are no contested issues of fact since the controversy turns solely upon the proper construction of the applicable section of the said Pension Plan under the circumstances here involved.

### Important Dates

November 17, 1957 — Barsi's death.

August 31, 1956 — The date of his retirement as an employee of defendant. It was also the date of a letter written by him to the President of the defendant, the contents of which require discussion.

September 17, 1956 — Date of reply to the above.

October 15, 1956 — Date of a letter written by Barsi for the attention of the Pension Committee of the defendant. This requires discussion.

---

### Jurisdiction

The plaintiff Gediman, as executor under the Barsi will, is a resident of this State, the will having been admitted to probate on April 24, 1958 by the Surrogate's Court of New York County. The inclusion of George A. Barsi as administrator c. t. a. indicates a technical but unimportant matter. The defendant is a Missouri corporation.

### Amount Involved

The plaintiffs aver that the amount payable according to the provisions of the said Plan is $84,582, for which judgment is demanded in the first and second causes of action.

The answer of the defendant contains the following closing paragraph:

"Wherefore defendant demands judgment dismissing the complaint

except to the extent that the court may determine that one or the other plaintiff is entitled to some recovery under Defendant's Salaried Employees' Pension Plan."

This somewhat cryptic attitude means that there is in evidence correspondence between the parties prior to the institution of litigation, the effect of which is to concede that there is payable under the said Plan what is called a death benefit in the sum of $32,790.44. Thus, the controversy really involves the difference between $84,582 (early retirement pension) and $32,790.44 (death benefit) or about $52,000 in round figures.

█ It will be convenient at the outset to discuss a matter not pleaded but which has been asserted in the final submission of the case, namely, that either the wrong defendant has been sued or that there has been a failure to join a necessary party, St. Louis Union Trust Company, as trustee. That company is the trustee named in the Pension Plan, and the argument made by the defendant is that a money judgment against Anheuser is not appropriate even as to the sum conceded to be payable. In a sense, that is true, because the trust fund was created by the defendant with the trust company named as trustee, and all payments made into the trust fund were by the defendant, and consequently a plaintiffs' judgment should be paid by the trust company and not out of the general properties and assets of the defendant.

That theory should not be permitted to obscure the fact that under date of May 16, 1958, which was prior to the filing of the complaint herein, the trust company wrote to the attorney for the plaintiff (Exhibit 10) as follows:

"Dear Mr. Slack:·

"In re: Anheuser-Busch, Salaried Employees' Pension Trust, Trustee U/A T.D. 70052

"We have received your letter of May 14, requesting that you be furnished with a complete copy of the Anheuser Busch Salaried Employees' Pension Plan. We are acting as Trustee under the trust agreement, *but the scope of our authority does not include the administration of the plan, the determination of benefits and similar matters.* I believe that your request should therefore be addressed to the Pension Committee appointed by the Board of Directors of Anheuser-Busch, Inc., and suggest that you write direct to Mr. Reid McCrum, Treasurer of the Corporation. [Ital. supplied.]

> "Very truly yours,
> J. W. Kouri
> Pension Trust Officer"

An examination of the Plan indicates that the foregoing letter correctly states the relationship between the defendant and the trust company. This means that any judgment to be rendered in favor of the plaintiffs against the defendant at the request of the latter would be payable out of the trust funds being administered by the trust company under the direction of the defendant's Pension Committee.

It seems unnecessary to pursue the subject further even though the action is not in rem against the fund but in personam against the defendant corporation. The satisfaction of the judgment is a mere matter involving the capacity of the defendant to direct the payment of the proceeds of any such judgment out of the trust fund instead of from its general assets.

No motion was made to dismiss the action prior to the trial because the wrong defendant was named, nor was there a motion to add a necessary party defendant.

Finally, it appears that under date of July 8, 1958 (Plaintiffs' Exhibit 7) the general counsel for the defendant wrote to the plaintiffs' attorney:

"Dear Mr. Slack:

   *    *    *    *    *    *

"We also have this problem. It now appears that Mr. Barsi's estate is entitled to only approximately· $32,000

rather than the approximate $84,000 contained in your demand.

"I, therefore, make the suggestion that you consider and determine any of the following alternatives.

\* \* \* \* \* \*

"(c) That a declaratory judgment suit be brought by Gediman in New York *against Anheuser-Busch, Inc. to adjudicate the amount and the payment.* [Ital. supplied.]

> "Very truly yours,
> Dwight D. Ingamells"

While the pending action in form is not one seeking a declaratory judgment, it is not without significance that the general counsel for the defendant company was of the view that such an action against this defendant would be appropriate.

■ It is believed that within the purpose of F.R.Civ.P. rules 15(b) and 57, 28 U.S.C.A., the Court may consider that the pleadings have been amended to conform to the proof, and that in effect a declaratory judgment is thereby rendered proper for the disposition of this controversy.

Sight has not been lost of the provisions of Paragraph 6 of Part I of the Plan that no legal or equitable rights against the company, the trustee or the Pension Committee are to arise by virtue of the Plan "except as herein expressly granted to them."

Since it is thought that certain rights are so created, the limitation does not deprive the court of the power so to adjudicate this controversy.

### The Causes of Action as Pleaded

The first, according to the amended complaint, asserts in effect a breach of contract based upon Barsi's status under the Plan at the time of his death, when there was said to be due and owing to the plaintiffs the sum of $84,582, as to which demand was made and refused.

While the second is stated to be distinct, it is in effect also an assertion of a breach of the said contract based upon correspondence which passed between Barsi and Anheuser with respect to Barsi's rights under the Plan, and which correspondence resulted in the recognition of an obligation to pay the last-mentioned sum, as to which demand has been refused.

The third repeats the allegations above referred to, and asserts that Barsi elected in writing to receive from the defendant the said sum "in cash or by defendant's application of said cash sum to the purchase of an annuity for him and he gave due written notice to defendant of his said election." Further that the defendant advised Barsi in writing that he had a vested interest in the Pension Plan having a present value of $78,356, and that "if he elected to defer payment until May 1, 1958, his vested interest would thereby be increased and there would be paid and distributed to him on May 1, 1958 the larger sum of $84,582."

That Barsi relied upon said representations and made his election as above recited, and so advised the defendant.

That the defendant refused to pay the said sum in response to demand and advised that Barsi's estate was entitled to receive "only approximately $32,000. under said Pension Plan." Then follow allegations that the representations above referred to were false "and were known to defendant to be false when made, or said representations were made by defendant without any knowledge that they were true, recklessly, carelessly and without regard as to whether they were true or not; and the true facts and circumstances which were known to or could have been ascertained by defendant were fraudulently suppressed and concealed from James E. Barsi by defendant."

That such representations were made with knowledge that Barsi would rely thereon "and with the purpose of inducing James E. Barsi to elect to defer until a later date his demand to receive and his receipt of the moneys due him under the aforesaid Pension Plan."

Further that the representation was that if Barsi elected to defer receipt of

the moneys payable to him until May 1, 1958 "but died prior to May 1, 1958, he would receive less than his vested interest of $78,356", the amount of which sum was unknown to Barsi, in violation of a duty on the part of the defendant to correctly and fully inform him.

Further that Barsi did rely upon said representations and that if he had not so relied by reason of the concealment attributed to the· defendant, he would have elected to receive immediate payment of the said so-called vested interest in the said sum of $78,356, whereby his estate has been damaged "in an amount equal to $78,356. reduced by the sum which plaintiffs are entitled to recover upon the prior causes of action herein."

The answer denies that the plaintiffs are entitled to the amount claimed, and pleads the terms and conditions of the said Plan; also reference is made to the said correspondence and all matters pleaded in the third cause of action are denied, namely, that there was any fraud or misrepresentation.

Since all the plaintiffs' asserted causes involve the correspondence referred to, it will be convenient now to discuss the letters in connection with the third cause, as to which, in the opinion of this Court, the plaintiffs have failed to sustain their burden of proof.

The several letters follow:

[Plaintiffs' Exhibit 2:]
"Jackson, California
August 31, 1956
"Mr. August A. Busch Jr.
President
Anheuser-Busch Inc.
721 Pestalozzi St.
St. Louis, Mo.
"Dear Mr. Busch:

"I had planned to see you in St. Louis before August 31st, 1956, but had to return to the coast due to the death of my Aunt Margaret.

"The purpose of seeing you in St. Louis was to discuss with you personally, because of our long and friendly relationship through the years, the options embodied in the Company pension plan.

"In as much as you are Chairman of the Pension Committee, and are throughly [sic] familiar with the Charter, I feel that I should present my case directly to you for consideration and action.

"It is my desire to have you personally make a complete review of my case. My reasons for the above statement is: 'no one except you know what my contributions have been to you and Anheuser-Busch, over my 25 years of loyal, productive and trustworthy service.'

"The following points I would like to have you give *your* special consideration too [sic]:

"1. A quarter of a century of the best years of my life were given to you and the Company.

"2. Your present pension plan does not give proper weight and consideration to employees with my length of service. Your pension plan would have been most beneficial to me in the next ten years.

"3. It would have increased my benefits from $80,000.00 to $230,000.00.

"4. I feel that you personally would want to give special consideration to me in regards to the pension plan.

"The reason your consideration is so important, is due to a health condition that materialized during my tenure with Anheuser-Busch Inc.

"In case your consideration is not forthcoming it leaves me no alternative but to make a most serious decision which I am not qualified to make, as I am not fully informed of all the various phases and ramifications contained in the Pension charter. You as Chairman, have the flexibility to *deviate from* the Charter itself [ital. added]. If you feel that work and effort does not warrant your special interest in me, it leaves me no alternative, but to advise, 'I would like to receive payment of my pension in the form of a cash lump payment set forth on page 12, paragraph 15, subdivision (C) (II) of the booklet entitled "Salaried Employees' Pension Plan"' or a single amount premium life annuity

contract issued by an insurance company as set forth on page 12 (C) (I) in the above booklet. I also elect to take $1000.00 paid up life insurance and the opportunity of converting the remaining $9,000.00 insurance policy of my choice without a physical examination.

"As stated before, the 25 years spent with you and the Company were my working lifes' [sic] contribution and it is extremely difficut [sic] to start over at 55 years of age.

"I am leaving the decision to your good judgment.

"My last request is that you personally handle my case and not delegate it to others who are not cognizant of my contributions to the Company over the years.

"Kindest personal regards to you and Mrs. Busch and the family.

"Sincerely yours,
James E. Barsi

"JEB/ed

"P.S. My present address is 1256 Market St. San Francisco, California.

"I am sending this to you registered mail in order that it my [sic] get directly to you."

[Plaintiffs' Exhibit 3:]

"Anheuser-Busch, Inc.
St. Louis 18, Mo., U.S.A.

"September 17, 1956

"Mr. James E. Barsi
1256 Market Street
San Francisco, California

"Dear Jim:

"Am sorry for this late reply to your letter of August 31, but I have been away from the city and returned to the office only this morning.

"In the meantime, I have had our Insurance Department follow through on your request and am attaching herewith the information that has been furnished me on the subject of your pension benefits by our pension consultants.

"I am sure you realize, Jim, that the company and I fully considered your long and faithful services, which we evidenced by an extension of your salary payments through August 31, 1956, and by other considerations extended you prior to your retirement.

"Under the circumstances, it is felt that this is as far as we can go notwithstanding that all of us and particularly myself were and still are interested in your personal welfare.

"As I am entering the hospital today * * * and do not expect to be available at the office again until after October 1, I hope the attached will enable you to reach a decision as to the plan you prefer to adopt.

"In order to avoid any unnecessary delay and to more quickly expedite matters, inasmuch as the attached calculations are based on a distribution date of October 1, 1956, may I suggest that you direct your reply to Dick Meyer, who will promptly follow through and give the matter his personal attention.

"Concerning the conversion of your group insurance coverage, I assume Mr. Lake's letter to you, dated August 30, 1956, satisfactorily advises you in this regard.

 *     *     *     *     *     *

"With my warmest regards.

"Sincerely,
Gussie
August A. Busch, Jr.

"Illustration regarding Pension Benefits Applicable to

Retirement of James E. Barsi

"Assuming Distribution Commences October 1, 1956

"W. Alfred Hayes & Co., Pension Consultants 1212 South Big Bend Road, St. Louis 17, Mo.

"1.  *Cash Distribution*: Present value $78,356, distributable with interest as follows:

| 1956 | 1957 | 1958 |
|------|------|------|
| $65,558 | $10,000 | $ 4,132 |

"Taxable as 'ordinary income' as received.

"2.  *Single Premium Deferred Annuity Contracts:*

"In 1956, 1957 and 1958, the Trustee of the Plan would purchase and

assign over to you, such single premium deferred annuity contracts as could be purchased in those years by application of the amounts shown in 1.

"Your taxable receipt of 'ordinary income' would not commence until you chose to take payments under such contracts; the death benefit under the contracts would not be included in your taxable estate (before payments start the death benefit would be the single premium paid, or cash value, if greater, after payments start the death benefit would depend upon income option selected by you); and any amount, provided the entire benefit is received by your beneficiary in one calendar year, would be taxable as a 'capital gain'.

"3. *Postponed Cash Distribution:*

"Your vested interest, present value $78,356, could be deferred by the Committee and distributed to you on May 1, 1958, in the amount of $84,582, or even deferred further and distributed at age 65 in the amount of $136,122.

"Such cash distributions would be taxable as 'capital gains' in the year received by you. If your death occurs prior to your receipt of such distribution, the death benefit would not be as much as the death benefit described in 2, but tax-wise, the death benefit would be treated the same as in 2.

"These comments regarding taxes are based on present laws.

"Please note in the above illustrations that the amounts mentioned, representing one-sum 'present values' are slightly lower than those furnished on the basis of an illustration of early retirement benefits sent to Mr. Barsi last year. That variation is due to the fact that since the original illustration was prepared, the Government required Anheuser-Busch, Inc. to increase, retroactively, the interest discount rate used in determining present values, from 2¼% to 2½%.

"Please note also from the above illustration that we are unable, under the

Plan, to give Mr. Barsi the full amount this year, but that May 1, 1958, is the earliest date on which Mr. Barsi's entire benefit could be paid to him in one installment so as to enable him to use the capital gains tax rate. This restriction is imposed upon the Plan by the Government, by reason of the fact that Mr. Barsi was included in the list of twenty-five highest paid employees.

"Methods of monthly income payments have not been included in illustration, as apparently Mr. Barsi is not interested in that type of distribution."

[Plaintiffs' Exhibit 4:]

"October 15, 1956

"Mr. Richard Meyer
Anheuser-Busch, Inc.
St. Louis 18, Mo.

"Re: Pension

"Dear Dick:

"Under date of September 17, 1956, Mr. Busch suggested that I communicate directly with you with reference to my pension. As I understand the 'illustration' prepared by W. Alfred Hayes & Co. and attached to Mr. Busch's letter, if I elected to postpone a cash distribution, such cash distribution would be taxable as 'capital gains' in the year received by me.

"Under the circumstances, it is my desire that the Committee defer the cash distribution to May 1, 1958, so that I may then report the distribution as a capital gain. Will you please inform the Committee accordingly.

"With best regards,

"James E. Barsi"

[Plaintiffs' Exhibit 5:]

Letterhead of Anheuser-Busch, Inc.
St. Louis 18, Mo., U.S.A.

"November 19, 1956

"Mr. James E. Barsi
c/o Paul Masson, Inc.
1256 Market Street
San Francisco, California

"Dear Mr. Barsi:

"Referring to your letter of October 15, addressed to Mr. R. A. Meyer, we are pleased to inform you that the Salaried Employee's Pension Committee has ap-

proved cash payment, on May 1, 1958, of the funds available to you under the Anheuser-Busch, Inc. Salaried Employees Pension Plan.

"Kind regards.

"Cordially,

Reid McCrum

Treasurer"

The reasons upon which the conclusion has been reached above stated, with reference to the plaintiffs' third cause, become apparent upon careful consideration of the first letter written by Barsi. To this Court, it is clear that the writer sought special consideration concerning his pension by reason of the four points listed by him (following the fourth paragraph of his letter) which embody his reasons for urging that he was entitled to receive something in excess of what the Pension Plan itself provided.

The reference in Exhibit 2 to certain paragraphs in the Pension Plan booklet (Exhibit 8) indicates that Barsi was sufficiently informed to cause him to ask for a deviation from the Plan, that would enhance his rights thereunder. This means that he was not in the dark on the subject and therefore had to turn to someone else to lead him into a position of understanding.

That the request for special consideration was understood to be just that, appears from the defendant's letter of September 17, 1956 (Exhibit 3).

The company had no selfish purpose to serve by explaining the alternatives to the selection of an annual pension payment which Barsi could have received for life; nor to point out to him the tax incidents of his possible election to capitalize on retirement, the then value of those annual payments. That this subject was deemed to be important by him appears from his letter of October 15, 1956 (Exhibit 4). Since the defendant had nothing to gain or lose as the result of Barsi's election, there was no temptation to misrepresent, nor is there any evidence to sustain the argument that by failing to state the amount which would be payable as a death benefit, the defendant practiced any form of deceit or misrepresentation, active or passive, that caused Barsi to select the form of payment which he supposed would be most favorable to him.

The death benefit aspect of the case will be discussed below.

■ For failure to sustain their burden of proof, the third cause pleaded by the plaintiffs is dismissed.

Turning now to the causes labeled First and Second, it will be seen that they sound in contract; that relationship is deemed to be present by virtue of the promulgation of the Plan as of November 1, 1947 as expanded and replaced as of November 1, 1952, and the continued rendition of services by Barsi as one of its high salaried employees continuously until August 31, 1956 when he retired. There is no argument to the contrary made by the defendant.

The first cause is based squarely on the theory that the sum of $84,582 was that which Barsi elected to receive on May 1, 1958 and that it became due and payable to his executor on that date, following Barsi's death on November 17, 1957.

The second cause repeats the allegations of the first and pleads the correspondence above set forth.

Paragraph 23 of the complaint avers that "by reason of the premises" the said sum of $84,582 became due and owing to the plaintiffs.

It is not too clear whether the plaintiffs assert an independent cause sounding in contract to be spelled out from the said correspondence, or that the subject-matter of the second cause is actually pleaded as evidence in support of the first.

■ In the opinion of this Court, the contract rights of the plaintiffs are confined to the terms and conditions of the Plan itself. No new or independent cause is deemed to be exposed in the said correspondence for the reason that no authority has been shown on the part of those who wrote the letters for the defendant, to create any obligation on its

behalf with respect to pension payments except as the Plan provides. It matters not whether the second cause be dismissed for failure of proof or considered together with the first, as an amplification thereof, since the plaintiffs' claims for relief must be examined and adjudicated according to the applicable provisions of the Plan. Quotations therefrom will be confined to the salient terms, and brief comment will be offered as thought to be requisite.

The document itself is Exhibit 9 (the implementing trust agreement is Exhibit 11).

*The Plan*

## "Part I

### "*Creation of the Plan*

"1. This Plan which, *to the extent provided herein,* replaces a predecessor plan established November 1, 1947, shall become effective as of November 1, 1952. [Ital. supplied.]

"2. This Plan, together with the Trust with the St. Louis Union Trust Company created by the Company concurrently herewith and as a part hereof, shall be known as the 'Anheuser-Busch Salaried Employees' Pension Plan.'

" 'Group Annuity Plan,' sometimes called 'predecessor plan' when applied to participants transferring therefrom, refers to the plan established by the Company on November 1, 1947, under its Group Annuity Contract number GA–235 with The Prudential Insurance Company of America. The Group Annuity Plan, except as provided in Section 1 of Part II hereof, will no longer provide Company benefits for the salaried employees who are or become eligible to participate hereunder but, as so amended, is being continued solely for the other employees who are or become participants to that plan.

" 'Participants,' unless referring directly to the Group Annuity Plan or predecessor plan, shall include all employees who qualify to become, and have become, participants of this Plan as hereinafter provided.

" 'Beneficiaries' shall refer to all who become or are designated to become entitled to any amounts becoming payable hereunder by reason of death.

" 'Company,' in addition to referring to the Principal Employer, Anheuser-Busch, Incorporated, and any successor who assumes the liabilities hereunder * * *.

"6. Neither the establishment of the Plan or Trust, nor any modification thereof, nor the payment of any benefits, shall be construed as giving any participant or other person any legal or equitable rights against the Company, Trustee, or Pension Committee, except as herein expressly granted to them; * * *."

Comment:

The reference to the predecessor plan is made because while it was partially superseded, there seems to be carried forward into this one, some recognition of status resulting from the existence and operation of the earlier plan, since participants are described as "transferring" therefrom. It is not stated, however, that in so doing they are deemed to have been stripped of any then existing status.

The reference to "beneficiaries" serves to introduce the death benefit provisions later to be discussed.

## "Part II

### "*Details of the Plan*

"1. *Immediate Objective:* The objective of this Plan, in the course of revising the retirement program of the Company for salaried employees who are or become eligible hereunder, is to substitute the benefits of this Plan, *retroactively,* [ital. supplied] for those that would be provided from Company funds in the Group Annuity Plan; and, furthermore, to substitute this Plan and Trust as the method of administering not only the future contributions of the Company with respect to employees becoming participants hereof, but also the Company's funds that will be needed in providing that part of the benefits hereunder which may already have accrued to participants

hereof during participation in the predecessor plan. * * *

"2. *Pension Committee:* There shall be appointed by the Board of Directors of the Company, to serve at its pleasure, a Pension Committee * * * to consist of three (3) participants of the Plan. The Committee shall construe the Plan and Trust and administer the Plan consistently with the provisions hereof and uniformly in respect to all persons similarly situated, and to that end, without amending the Plan or Trust, may establish rules and regulations which shall be binding on all persons, or amend or revoke them. Among other things, the Committee shall determine under the provisions hereof all facts relative to the eligibility, participation, or benefits of any employee or participant, the time and method of distributng such benefits and the names of the persons to receive them; * * *.

"The. Company, the Trustee, and the participant or any beneficiary or other person claiming through the participant shall be bound by the action or nonaction of the Committee in its administration hereof, and by the acts of the Trustee or Company pursuant thereto. * * *."

Comment:

The purpose of the foregoing quotation is to indicate, in addition to the objects in view, the function of the Pension Committee, in light of which parts of the letters above quoted are to be construed.

"3. *Date and Standards of Eligibility:* The date and standards of eligibility for participation herein are as follows:

"(a) *Group Annuity Participants:* Any salaried employee participating in the Group Annuity Plan on October 31, 1952, shall be eligible to participate hereunder on the effective date of this Plan (November 1, 1952), if he is then so classified and has not attained his sixty-first (61st) birthday. * * *" (Barsi had not.)

"4. *Date of Coverage; Method of Becoming a Participant:*

"(a) *Group Annuity Participants:* Any Group Annuity participant who is eligible to become a participant of this Plan as of the effective date hereof or any subsequent date, as above provided, shall be covered automatically by this Plan as of such date. * * *"

"5. *Date of Retirement:*

"(a) *Normal Retirement Date:* The normal retirement date hereunder of any participant shall be on the first day of the month coinciding with or next following his sixty-fifth (65th) birthday.

* * * * * *

"(c) *Early Retirement Date:* Any participant, with the consent or at the request of the Company, may be retired on any date prior to his normal retirement date, which date is referred to as the Early Retirement Date."

"6. *Effective Benefit Date:* A participant's Effective Benefit Date is the date as of which the payment of his retirement or other severance benefits hereunder either commenced, or are scheduled to commence, (subject to later provisions herein regarding postponed retirement). The Effective Benefit Date shall be the normal retirement date, although employment was previously terminated, unless an earlier date for the payment of benefits, (called 'Early Benefit Date'), shall have been selected and approved as hereinafter provided in Sections 10(c) and 11 of this Part."

7. *Amount of Normal Retirement Benefit,* etc. This section need not be quoted in full, but must be consulted to indicate what it was that Barsi chose not to avail himself of as a Class A participant who was transferred from the predecessor plan.

Under Formula B there will be found Subdivision (a) dealing with "Past Service Pension" namely, "service rendered prior to November 1, 1947, as defined in Item (a) of Formula A preceding." This section also deals in Subdivision (b) with "Future Service Pension."

8. *Alternate Methods of Distributing Lifetime Benefits:* This treats of alternate methods of distributing lifetime benefits, which is the basis for the plaintiffs'

claim concerning Barsi's election, namely:

"* * * (c) The payment in one sum of the actuarial value of the benefit as of the Effective Benefit Date (including a surrender charge at the rate then determined by the Committee in accordance with the authorization contained in Section 2 of this Part); provided, however, that as the Committee may determine, such payment may be made either, or both, (i) in the form of cash, or (ii) by the purchase and transfer by Trustee of a commercial single premium annuity contract endorsed as the Committee may determine."

### Comment:

The foregoing is that section of the Plan discussed in the memorandum which accompanied the defendant's letter to Barsi of September 17, 1956, in reply to his inquiry of August 31. Both are quoted in full above. It will be remembered that Barsi referred to the provisions of the booklet, Plaintiffs' Exhibit 8, which deals with this subject.

Barsi, when he wrote Exhibit 4 on October 15, 1956, being a 56 year old participant in the Plan (having transferred from the Group Annuity Plan and having arranged for an early retirement date instead of waiting until he should reach the age of sixty-five) decided not to take annual pension payments, but to receive a capital sum which would of course be in full discharge of his pension rights.

To this the defendant acceded, and provided him with a statement of the applicable figures. [See Exhibit 3 concerning the postponed cash distribution and taxable incidents.]

It will be recalled that this exhibit contains the following:

"If your death occurs prior to your receipt of such distribution, the death benefit would not be as much as the death benefit described in 2, but tax-wise, the death benefit would be treated the same as in 2."

It was of course open to Barsi to reply by asking the direct question as to how much less the death benefit would be, if his death should occur prior to the receipt of such distribution, than the sum of $78,356 but he did not do so. Instead, he said (Exhibit 4):

"Under the circumstances, it is my desire that the Committee defer the cash distribution to May 1, 1958, so that I may then report the distribution as a capital gain * * *."

So far from demonstrating a breach of contract, the correspondence is compatible only with an explanation of the choices which the Plan presented to him, leaving it to him to elect which would be the most desirable, and this he proceeded to do. The use of the words "your vested interest" as denoting the sum which he was entitled to receive, added nothing to the provisions of the Plan, and could not be interpreted as a kind of bait to induce him to accept a deferred payment instead of an instant one. His preoccupation with the taxable aspect of the situation is understandable and enlightening.

This means that since Barsi's death occurred prior to the receipt by him of the said postponed cash distribution, no breach of contract has been established arising from the defendant's failure to pay his executor the sum of $84,582. What the Plan did provide was the payment—under such circumstances—of the death benefit; it is to the construction of that provision of the Plan to which the Court is now required to turn.

The issue narrows itself down to the question of whether the plaintiff is entitled to the sum demanded in the complaint for the reasons heretofore discussed, or is remitted to a claim for the death benefit, and the sum payable thereunder.

Recourse must be had to the language of Sections 10 (Early Retirement Benefit, etc.) and 11 (Effect of Termination of Employment Prior to Early Retirement) and 12 (Payments upon Death of Males Occurring on or before Effective Benefit Date).

These are too long to justify repetition herein, since the precise controversy is so clearly stated in defendant's post trial

memorandum that the following is quoted therefrom:

"It is not disputed that the death benefit payable is controlled by the provisions of Part II, Paragraph 12 of the Salaried Employees' Pension Plan, which in pertinent part reads:

"'an amount shall become payable equal to the then actuarial value of the future service pension which * * * shall have accrued during his participation in this Plan * * *.'

Both sides agree that this actuarial value may be computed by multiplying the annual future service pension which has accrued by the actuarial factor of 7.8856. But what is the annual future service pension which has accrued during participation in 'this Plan'?

"It is plaintiffs' contention that the future service pension which has accrued for the purpose of computing death benefit under Paragraph 12 is exactly the same as that which has accrued for the purpose of computing an early-retirement pension under Paragraph 10(b) (ii). Paragraph 10(b) (ii) states that the future service pension on early retirement

"'shall be deemed to be that proportion of the future service pension stipulated for normal retirement by the formula, that (1) the number of consecutive years of participation in this Plan and the Group Annuity Plan prior to the early retirement, bears to (2) the total number of years that he would have so participated had participation actually extended to normal retirement date.'

In other words, the future service pension at normal retirement date is to be multiplied by a fraction. The numerator of the fraction is the actual number of years of participation in this Plan and the Group Annuity Plan; the denominator is the total number of years of participation in both plans had there not been an early retirement. Both sides agree that in Barsi's case the numerator would be 9 and the denominator would be 19, *for the purpose of computing an early-retirement annual pension under Paragraph 10.*

"Plaintiffs further contend, however, that this same fraction should be applied for the purpose of computing a death benefit under Paragraph 12. The argument would have validity if, instead of reading the way it does, Paragraph 12 read:

"'an amount shall become payable equal to the then actuarial value of the future service pension which * * * shall have accrued during his participation in this Plan *and the Group Annuity Plan* * * *.'

The language would then parallel that of Paragraph 10(b) (ii) and would justify the application of the same fraction. But Paragraph 12 does not so read. There is no reference to benefits which accrued under the old Group Annuity Plan. It is evident that only that part of the future service pension which accrued during participation in 'this Plan,' that is the Salaried Employees' Pension Plan adopted November 1, 1952, is to enter into the computation." (pp. 2–4.)

It will be seen that the foregoing argument necessarily means that the words "this Plan" do not contemplate for the computation of the death benefit, Barsi's participation from the years 1947 to 1952.

The practical aspect of the situation is this: If in fixing the death benefit the formula according to Section 10 is followed, the plaintiffs will be entitled to judgment in the sum of $73,754.02 [see Exhibit 14]; if the formula according to Section 12 excludes the five-year period elapsing between 1947 and 1952 in the same computation, the plaintiffs will be entitled to recover, in round figures, $32,000 [see Exhibit 14].

This difference is so wide that an explanation for it should be convincing.

The defendant's argument is buttressed by the following:

Plaintiffs' Exhibit 8, the booklet, paragraph 12:

"If a Male Dies *Before* Age 65 or Earlier Benefit Date

"An amount will be paid to his beneficiaries equal to the then value of the retirement benefit which, on the basis of service rendered since November 1, 1952, had accrued during the period while he was a member of this Plan and had not been cancelled. (Such accrued benefit would not have been cancelled by a prior termination of employment or membership in this Plan if such termination had occurred either as an early retirement in accordance with Section 8, or after he had completed 20 years of continuous service.)"

And also the testimony of the witnesses Stauber and Rathert to the effect that the foregoing was discussed with Barsi prior to his making the choice heretofore discussed.

Neither the booklet nor the testimony suffice to relieve the Court of the duty of interpreting the terms of the Plan itself for the purposes of this case, and the precise inquiry is whether the words "this Plan" in Section 12 necessarily exclude participation in the death benefit except as the defendant computes it.

There is no testimony in the case to explain why as a matter of principle, services rendered from 1947 should enter into the pension payment but not the death benefit. If there had been offered competent testimony to the effect that the provisions of the latter imposed a clear financial burden upon the trust fund that had not existed prior to 1952, the Court would not have been left in the dark on this subject.

Sight has not been lost of the testimony of James H. Collins, commencing at page 255 of the record. He was the one who made most, if not all, of the calculations which have been received in evidence, and his qualifications as an actuary were conceded.

At page 256, the following occurs:

"Q. Will you tell the Court how you computed that figure [death benefit]? A. This figure was based upon the facts in existence at that time. It represents the contributions that were made to the pension plan for three years to the credit of Mr. Barsi, which was the method being used at that time.

"Q. So that that figure of $41,984.00, you say, represented the contributions which had been made by Anheuser-Busch to the pension plan for the account of Mr. Barsi? A. That's right."

Then at page 259, explaining a change in the method of calculation, he said:

"The Witness: Then in 1955 we changed our method of determining costs in order to be compatible with the I.B.M. processes. * * *"

At page 260:

"The Witness: This increased the cost basis for contributions to the plan for his benefit.

\* \* \* \* \* \*

"When the plan was first put into effect, we carried forward in essence the same sort of actuarial methods that were used under the predecessor plan. That is, we determined costs on a level basis.

"The death benefit at that time, or costs for the death benefit, were being funded over the total years to a man's normal retirement date; and it was based on the assumed fact that his death benefit would be halfway between what he would get in 1952 and at retirement.

"In 1955, the Government said that we were using a method which produced a cost too high. So we changed our method of valuation or determining costs to what is referred to as an entry age normal method.

\* \* \* \* \* \*

"The Witness: Yes, this lowered the cost for future service, and at this time it was not then practical to use the same method in determining death benefits under the plan.

"So we switched then and adopted the current method of—that the death benefit is the value of the present value of benefits accrued to a person since November, 1952, the date of the plan."

It will be seen that the foregoing avoids any explanation demonstrating an increased financial burden on the part of the company entirely caused by the addition of the death benefit feature.

It is to be assumed that a man at age 46, as Barsi was in 1947, would have a different life expectancy than at age 55, and that actuarial computation in order to provide for a lump-sum pension payment in 1956 or 1958, would produce different figures for the respective ages. But the need for providing funds to meet such a pension payment figure from 1947, has not been shown to differ from a like fund to meet a claim for death benefit. In other words, it would seem that the difference in actuarial figures would be measured by the two periods of time, not by what the payment is called.

The defendant's position is that for pension purposes the Plan contemplated 1947 as the initial date of qualification, while for death benefit the year 1952 must be substituted because that was then brought into existence.

My difficulty lies in understanding why this must be true.

If an extended hazard were introduced in 1952 so that the fund became subject to a heavier impost than theretofore, there would be an apparent reason for not dating back the death benefit to coincide with the pension payment, and thus to accord limited meaning to the quoted words "this Plan" as the defendant urges.

There is no such demonstration in the record. Clearly the Plan was designed to be "retroactive" as to participants in the Group Annuity Plan; the defendant's argument means that it was so, for the purpose of pension computation, but not for death benefit.

In the absence of testimony concerning the mathematical requirements creating the wide divergence between the figures above recited, the argument does not command ready acceptance.

Obviously Barsi's length of service, salary, age and life expectancy were identical for the purposes of both sections, and apart from the language quoted from Exhibit 8 and the said testimony, there has been nothing offered to demonstrate that the Plan by its plain terms requires such disparate results.

I am persuaded that Barsi was given to understand that there would be a certain difference between the application of the two formulae, and made his choice deliberately, after having been so informed. If that were the only problem, the issue would be simple. But that does not prove that he was correctly informed, which is not to say that there was a distortion or suppression of the truth, for the testimony does not yield that result.

The witnesses for the defendant merely construed the Plan, as this Court ventures to believe, without support for their opinions based upon a complete mathematical analysis of its basic concepts.

It results that the proof is not deemed to demonstrate that the words "this Plan" in Section 12 require that Barsi's participation therein began only in 1952 for the purpose of computing the death benefit payable to the plaintiffs; therefore, that the formula according to Section 10 also applies to Section 12, and judgment must be granted to the plaintiffs in the sum of $73,754.02, with interest from the date of Barsi's death, November 17, 1957.

Settle judgment on five days' notice.

On Motion to Amend Finding

██ Defendant seeks by this motion an order pursuant to Rule 52(b), F.R.Civ. P., 28 U.S.C.A., "amending the Court's finding (193 F.Supp. at page 84), that there is no competent testimony in the case to explain why, as a matter of principle, services rendered from 1947 should enter into the pension payment but not the death benefit and (193 F.Supp. at page 85), that the proof is not deemed to demonstrate that the words 'this Plan'

in Section 12 requires that Barsi's participation therein began only in 1952 for the purpose of computing the death benefit payable to plaintiff; therefore that the formula according to Section 10 also applies to Section 12 so as to credit only service rendered by Barsi after November 1, 1952, in the computation of his death benefit; or, in the alternative, why the record in this case should not be reopened to receive testimony, if the Court is of the opinion that it is not already in the record, to explain why the decedent's services prior to November 1, 1952, are not to be considered in the computation of his death benefit."

In behalf of the second aspect of the motion, there has been submitted an affidavit by the witness Collins, verified April 21, 1961, which has been carefully considered.

It is first to be observed that the decision of which reconsideration is asked was not intended to deal with the Plan generally as to all employees of Anheuser, but only as to its operation in connection with the decedent Barsi.

The contentions offered by the defendant are:

(1) There was no death benefit comprehended in the predecessor plan of November 1, 1947.

That has been clearly understood from the outset of this case, and no additional testimony is needed to establish the fact that the death benefit aspect of the Plan is deemed to have become effective November 1, 1952. This means that it is not necessary to reopen the case in order that a copy of the predecessor plan may constitute a portion of this record.

(2) The decision is erroneous in that Section 12 of the Plan is held not to be dispositive of the controversy.

This contention can of course be presented on appeal from the decision of this Court.

(3) The supporting affidavit of Collins, verified April 21, 1961, contains matters not fully developed at the trial which would justify reopening the case to receive his additional testimony as so indicated.

For present purposes it will be deemed that Collins' trial testimony has been expanded to embrace the expository substance of his said affidavit.

In that connection, the concluding sentence of Paragraph 7 reads:

"Moreover, even had he survived longer than he did, no sum would have been set aside for him as an individual participant until the passage of his Effective Benefit Date on *May 1, 1958*." (Italics supplied.)

The foregoing does not tell the whole story.

Barsi's early retirement date was August 31, 1956 (See Part II of the Plan, 4(c)) and payment of the amount of his pension, ascertained as of that date, was deferred for reasons stated in the correspondence.

That which is here dealt with is not the case of any participant in the Plan who might die before receiving the sum otherwise payable to him as a pension upon reaching the effective retirement date, but with a man who had reached and passed the latter and who had elected to receive a lump sum in lieu of annual payment.

That amount was described as a "vested" interest in Plaintiffs' Exhibit 3 under the heading "Postponed Cash Distribution."

It seems clear that the Plan had created in Barsi a status different from that which would have prevailed had his death occurred before the writing of the letters, Plaintiffs' Exhibits 2, 3, 4 and 5.

Under these circumstances, it seemed to this Court that the provisions of Section 12 could not be read as controlling without reference to the provisions of Section 10, since Barsi was not in the position of a participant in the Plan who had died prior to exercising the privilege which the Plan conferred upon him, and which has been explained above.

It was in this sense that the language quoted from the opinion is to be understood:

"If there had been offered competent testimony to the effect that the provisions of the latter imposed a clear financial burden upon the trust fund that had not existed prior to 1952, the Court would not have been left in the dark on this subject."

For clarity, the words "that had not existed prior to 1952" in the above are withdrawn.

It seemed then, and the view persists, that Collins' testimony, even as expanded for present purposes, does not explain why the disposition of the Barsi claim does not invoke Section 10 in construing the meaning to be attached to the words "this Plan" in Section 12.

It results that the defendant's motion must be and hereby is denied.

Settle order.